VanVOROUS v BURMEISTER

Docket No. 248450. Submitted May 19, 2004, at Marquette. Decided June 15, 2004, at 9:25 A.M.

Darlene VanVorous, as personal representative of the estate of John VanVorous, brought an action in the Menominee Circuit Court against Eric Burmeister, Paul Anderson, and Daniel Bartell, law enforcement officers, seeking damages for assault and battery, gross negligence, intentional infliction of emotional distress, and for a violation of the decedent's Fourth Amendment rights stemming from alleged excessive force after a vehicle chase. In a prior action involving the same parties, the United States District Court for the Western District of Michigan had considered whether qualified immunity should be applied to the defendants' acts and whether the decedent had a Fourth Amendment constitutional protection from excessive force. The district court granted the defendants summary disposition on the constitutional issue while dismissing the remaining counts without prejudice. The circuit court, Mary B. Barglind, J., granted summary disposition for the defendants. The plaintiff appealed, claiming in part that summary disposition was premature because discovery was incomplete.

The Court of Appeals *held*:

1. The plaintiff's claim of incomplete discovery did not bar summary disposition for the defendants because the plaintiff made no assertion regarding what facts were disputed or likely to be uncovered by further discovery. Although Michigan's discovery rules should be construed broadly, Michigan's commitment to open and far-reaching discovery does not encompass an impermissible fishing expedition.

2. The plaintiff's claim relating to intentional infliction of emotional distress is a claim on a tort theory that has not officially been recognized by our Supreme Court. Generally, an element of this tort is extreme and outrageous conduct, that is, conduct that goes beyond all possible bounds of decency and is atrocious and utterly intolerable in a civilized community. The United States district court analyzed the behavior of the officers and determined that their shooting of the decedent was objectively reasonable. The circuit court has correctly concluded that the plaintiff's claim is barred by collateral estoppel.

3. The plaintiff's claim relating to assault and battery is also collaterally estopped. Certain governmental actors may find it necessary to act in way that would, under different circumstances, subject them to liability under a theory of intentional tort. Such governmental actors are permitted to act in those ways, unless the acts were not justified because they were not objectively reasonable, but the issue of objective reasonableness has been reached and decided by the United States district court.

4. The plaintiff claimed that excessive force, the shooting of the decedent, breached a duty of care owed to the decedent during the attempted apprehension, resulting in a negligence claim. However, the shooting was intentional and the plaintiff may not transform an intentional tort into gross negligence. The essence of this claim is excessive force, and, because the United States district court determined that the officers behaved in an objectively reasonable manner, not excessively, the issue is collaterally estopped.

Affirmed.

1. MOTIONS AND ORDERS — SUMMARY DISPOSITION — INCOMPLETE DISCOVERY.

Although incomplete discovery generally precludes summary disposition, summary disposition may nevertheless be appropriate if there is no disputed issue before the court or if further discovery does not stand a fair chance of finding factual support for the nonmoving party.

2. JUDGMENTS — COLLATERAL ESTOPPEL.

Where a question of fact essential to a judgment has been actually litigated and determined by a valid and final judgment, collateral estoppel bars a litigant from pursuing the same issue again.

*Petrucelli & Petrucelli, P.C.* (by *Vincent R. Petrucelli* and *Jonny L. Waara*), for the plaintiff.

*Plunkett & Cooney, P.C.* (by *Mary Massaron Ross* and *Camille T. Horne*), for Eric Burmeister.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Mark E. Donnelly*, Assistant Attorney General, for Paul Anderson and Daniel Bartell.

Before: WHITBECK, C.J., and GRIFFIN and BORRELLO, JJ.

BORRELLO, J. Plaintiff Darlene VanVorous appeals by right orders dismissing her claims of assault and battery, gross negligence, and intentional infliction of emotional distress filed on behalf of her decedent, John VanVorous, after he was shot and killed by defendant police officers. In this case, we are asked to determine whether the doctrine of collateral estoppel precludes plaintiff's state law claims where her Fourth Amendment excessive force claim has been adjudicated in federal court. Plaintiff also asserts that summary disposition was premature because discovery was incomplete. Because we agree with the trial court that the determination of plaintiff's state law claims rests on an identical issue decided by the federal court, and because plaintiff produced no support for her contention that further facts would change the outcome, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

The facts of this case, which were competently set forth in detail by the United States District Court for the Western District of Michigan, *VanVorous v Burmeister*, 2001 US Dist LEXIS 21759, *2-*10; 2001 WL 1699201 (citations to the record omitted), aff'd 2004 US App LEXIS 7920 (CA 6, 2004), are reprinted here for the reader's convenience:

At approximately 2 A.M. on September 7, 2000, [defendant Eric] Burmeister was dispatched, along with Sgt. Dennis Weaver ("Weaver") and officer Michael Pfankuch ("Pfankuch") of the Menominee police department, to a gas station to investigate a report of broken windows.[1] Burmeister observed someone crossing the street from an alley nearby and attempted to follow the individual on foot. As he entered another alley a block away, he heard someone yell and a vehicle squeal its tires. Burmeister saw a red Blazer-type vehicle enter the alley and stop.[2] He then heard a vehicle accelerate rapidly and saw smoke coming

from behind a nearby building. Pfankuch also saw the red Blazer squeal its tires at this location and then drive around a corner and through a stop sign. The officers later determined that VanVorous was driving the vehicle.

Burmeister, Pfankuch, and Weaver, each driving a Menominee police cruiser, turned on their overhead lights and pursued the vehicle through the streets of Menominee, generally traveling north and west. VanVorous disregarded numerous stop signs along the way. At one point, VanVorous briefly stopped to let a passenger out of his vehicle. After the pursuit led the police out of the city limits, Weaver ordered Burmeister to break off and return to town. Burmeister initially began to return to town, but when he heard on radio traffic the direction of the pursuit, he positioned his vehicle at the intersection of No. 2 Road and Highway 577, a place the pursuit was likely to cross.[3]

As VanVorous was traveling south on Highway 577, Weaver was in the lead car followed by Pfankuch. State troopers [defendant Daniel] Bartell and [defendant Paul] Anderson overheard radio traffic about the pursuit and informed dispatch that they would attempt to place "stop sticks" at the intersection of Highway 577 and Sobieski Road. The VanVorous vehicle reached that intersection before the troopers could position the stop sticks. When VanVorous reached the intersection of Highway 577 and No. 2 Road, he passed behind Burmeister's vehicle as Burmeister pulled forward to avoid him. VanVorous turned west onto No. 2 Road, also known as River Road, and the troopers took the lead position in the pursuit, followed by Weaver and then Pfankuch. Burmeister['s] became the fourth vehicle in pursuit, about a quarter-mile behind them. During this time, the vehicles were traveling between 40-50 miles per hour.

While driving west on River Road, VanVorous slowed down and turned his vehicle south onto a grassy area near a residential driveway. The VanVorous vehicle made a loop and headed back toward the road. Bartell and Anderson followed him onto the grass in their vehicle, and Weaver followed them in his vehicle. Weaver tried to make a sharper turn and get in front of VanVorous to box him in.

Pfankuch waited in the road when the vehicles entered the yard and then attempted to position his vehicle in front of the VanVorous vehicle as it turned around. VanVorous avoided both city police vehicles by slaloming between them.

Burmeister was driving his vehicle in the westbound lane of No.2 Road as he approached the scene. As the VanVorous vehicle weaved between the police cars and left the grassy area, Burmeister slowed his car to 5-10 miles per hour. VanVorous returned to the road, traveling east. Despite the eastbound lane being open and unabated, VanVorous accelerated and crashed into Burmeister's cruiser. The front of the vehicles collided driver's side to driver's side but not directly head on. Burmeister explained his reaction to the collision in an affidavit:

"Immediately after the collision, I recall my airbag being deployed in the police cruiser, as well as the sound of metal crunching and plastic breaking. I remember thinking to myself, "I can't believe I'm alive," and was very concerned about my safety given the fact that the VanVorous vehicle was continuing to push my vehicle backwards. I distinctly remember the smell of burning rubber, as well as smoke. I was very concerned about my safety as I was unable to open my driver's side door. Ultimately, I was able to kick the door open and was able to roll out onto the pavement."

After the collision, the fronts of the two vehicles were locked or fused together. The VanVorous vehicle's engine continued to rev, causing the rear tires to burn rubber on the asphalt and produce large amounts of smoke. The fronts of the two vehicles were still engaged and the VanVorous vehicle continued to attempt to accelerate as Burmeister rolled from his vehicle onto the pavement. At this same time, troopers Bartell and Anderson exited their cruiser and approached the VanVorous vehicle on the passenger side. The vehicles were traveling at about 2-3 miles per hour as the VanVorous vehicle pushed Burmeister's cruiser backwards. Bartell attempted to smash the passenger side window with his flashlight and Anderson began hitting it with his collapsible baton. Neither Bartell

nor Anderson had any difficulty keeping pace with the vehicle as it slowly moved toward the ditch.

When Burmeister rose to his feet, he was at the edge of his cruiser's front bumper. He testified that he saw Van-Vorous' hands moving the steering wheel to the right.[4] When Bartell smashed the passenger's side window, Van-Vorous continued to face forward and did not look in his direction. Bartell did not see VanVorous steering the wheel in Burmeister's direction. Anderson saw Bartell and Burmeister yelling at VanVorous with their guns drawn, and he drew his weapon as well. All of the officers testified that they shot VanVorous because they believed Burmeister's life was in danger because the VanVorous vehicle's engine continued to rev and vehicles began to separate from one another. None of the officers involved in the shooting could remember who fired first. Although they could not specifically remember how many shots were fired, the reports showed that Burmeister shot 11 times, and Bartell and Anderson each shot four times.

After the shooting, the VanVorous vehicle continued to accelerate and slowly push Burmeister's cruiser backward. Burmeister lost consciousness and fell to the ground. When the shooting ceased, Pfankuch approached the VanVorous vehicle and smashed the driver's side window with his baton. He observed VanVorous sitting up with his head slumped to his chest. Pfankuch unfastened the seat belt and pulled VanVorous from the vehicle, and Pfankuch and Anderson performed CPR, including the use of a defibrillator. Weaver notified dispatch of the accident and subsequent shooting, and he requested fire and medical assistance. Shortly after the arrival of medical personnel, VanVorous was pronounced dead at the scene.

---

[1] There is no allegation that VanVorous was involved in this activity. It was included in the report to explain why the officers were in the area when the vehicle chase began.

[2] The vehicle turned out to be a GMC Jimmy.

[3] Burmeister later testified that he was not attempting to set up a road block at that intersection but rather position his vehicle so he could rejoin the pursuit.

[4] This information was not included in the statement he made to a reporting lieutenant two hours after the incident.

Plaintiff then brought suit against defendants and the city of Menominee, claiming that the officers violated her son's Fourth Amendment right to be free from excessive force and that the city authorized, or acquiesced to, the behavior.[1] Arguing that they were entitled to qualified immunity, the defendant officers moved for summary judgment under FRCP 56(c), which requires dismissal of a claim where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."

The district court determined that, to resolve the question whether qualified immunity applied to defendants, it must engage in a two-step inquiry and analyze "(1) whether a constitutional right would have been violated on the facts alleged and, if so, (2) whether the right was clearly established." *VanVorous, supra* at *12, citing *Saucier v Katz*, 533 US 194, 201; 121 S Ct 2151; 150 L Ed 2d 272 (2001). Turning to the first step, the court first explained that a person's constitutional right to be free from excessive force is examined under a "reasonableness" standard. *Id.* at *13, citing *Graham v Connor*, 490 US 386, 395; 109 S Ct 1865; 104 L Ed 2d 443 (1989). The district court then summarized the reviewing body's task in judging the reasonableness of an officer's conduct:

> In determining the reasonableness of the officer's actions, the Court must give close attention to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to

[1] Only the claims against the individual defendants are at issue here.

evade arrest by flight." *Graham* [490 US 396]. This is an objective analysis "judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight." *Id.* The Court must recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. The Individual Defendants will not be shielded by qualified immunity "if, on an objective basis, it is obvious that no reasonably competent officer would have [shot the victim]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341; 106 S. Ct. 1092, 1096; 89 L. Ed. 2d 271 (1986). Put another way, "the central legal question is whether a reasonably well-trained officer in the defendant's position would have known that shooting the victim was unreasonable in the circumstances." [*Sova v Mt. Pleasant*, 142 F3d 898, 903 (CA 6, 1998)] (citing *Malley*, 475 US 345. [*VanVorous, supra* at *13-*14 (citations omitted).]

Concluding that the first step was met and that no reasonable jury could find that the officers' use of deadly force was unreasonable, the district court referenced the following facts. The officers shot VanVorous only after an extended car chase and only after VanVorous rammed his vehicle into Officer Burmeister's, seemingly on purpose, signaling that VanVorous was dangerous. After the collision, VanVorous's vehicle continued to push Burmeister's vehicle backward. Some testimony revealed that VanVorous's vehicle appeared ready to become disentangled from the police cruiser and that if it were to come loose, the vehicle could endanger Burmeister. Testimony from one officer also indicated that VanVorous was attempting to steer the vehicle. *Id.* at *18-*22. Thus, the court concluded, the officers' actions of shooting VanVorous were reasonable. A contrary conclusion, the district court emphasized,

would require violating the rule against using hindsight to determine whether conduct was reasonable. *Id.* at *23.

Then, assuming arguendo that the first step favored VanVorous, the district court turned to the question whether VanVorous had a clearly established constitutional right at the time of the shooting. A right is clearly established, the court explained, if " ' "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' " *Id.* at *24, quoting *Saucier, supra* at 202, quoting *Anderson v Creighton*, 483 US 635, 640, 107 S Ct 3034; 97 L Ed 2d 523 (1987). That inquiry, although objective, must be particularized to the circumstances of the case at hand. *Id.* at *25-*26, citing *Saucier, supra* at 202. In other words, "the ' "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" ' " *Id.* at *25-*26, quoting *Cope v Heltsley*, 128 F3d 452, 459 (CA 6, 1997), quoting *Saylor v Harlan Co Bd of Ed*, 118 F3d 507, 512 (CA 6, 1997) (emphasis in *VanVorous*). Thus, the court reasoned, in the case at hand, VanVorous's right would be clearly established only where the defendant officers did not reasonably perceive that VanVorous was a threat to them or others. *Id.* at *25.

The district court then concluded that because qualified immunity "allows room for an officer's discretionary judgment," plaintiff could not, as a matter of law, show that the officers' conduct violated a clearly established right. *Id.* at *26. Therefore, the court held, even if defendants "acted unreasonably, qualified immunity still protects those officers from suit because any mistake they may have made in analyzing the situation was reasonable." *Id.* at *27.

Consequently, the district court granted defendants' motion for summary judgment regarding the federal constitutional claim, but it dismissed plaintiff's state law claims without prejudice. While plaintiff's appeal was pending in the United States Court of Appeals for the Sixth Circuit,[2] plaintiff pursued the remainder of her claims against the officers in state circuit court. Defendants moved for summary disposition under MCR 2.116(C)(7), claiming that the federal district court's determination that defendants' use of force was reasonable collaterally estopped relitigation of that issue, so plaintiff could not establish an essential element of her claims. The trial court agreed, and plaintiff appeals.

## II. STANDARDS OF REVIEW

We review a trial court's decision on a motion for summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Whether a party's claim is collaterally estopped is an issue of law that we also review de novo. *Minicuci v Scientific Data Mgt, Inc*, 243 Mich App 28, 34; 620 NW2d 657 (2000). We review a trial court's decision regarding discovery for an abuse of discretion. *Shinkle v Shinkle (On Rehearing)*, 255 Mich App 221, 224; 663 NW2d 481 (2002).

## III. ANALYSIS

### A. DISCOVERY CLAIM

Plaintiff first argues that summary disposition was premature because discovery was incomplete. Although incomplete discovery generally precludes summary dis-

---

[2] The Sixth Circuit affirmed the district court's opinion in an unpublished opinion issued April 20, 2004. *VanVorous v Burmeister*, 2004 US App LEXIS 7920 (CA 6, 2004).

position, summary disposition may nevertheless be appropriate if there is no disputed issue before the court or if further discovery does not stand a fair chance of finding factual support for the nonmoving party. *Vargo v Sauer*, 215 Mich App 389, 401; 547 NW2d 40 (1996). "[A] party opposing a motion for summary disposition because discovery is not complete must provide some independent evidence that a factual dispute exists." *Michigan Nat'l Bank v Metro Institutional Food Service, Inc*, 198 Mich App 236, 241; 497 NW2d 225 (1993).

Although Michigan's discovery rules should be construed broadly, *Shinkle, supra* at 225, Michigan's commitment to open and far-reaching discovery does not encompass "fishing expedition[s]." *In re Estate of Hammond*, 215 Mich App 379, 386-387; 547 NW2d 36 (1996). Allowing discovery on the basis of conjecture would amount to allowing an impermissible fishing expedition. *Pauley v Hall*, 124 Mich App 255, 263; 335 NW2d 197 (1983). In the case at hand, plaintiff does not know what other facts might exist but asserts that further discovery would uncover factual support for her claims. Without any assertion regarding what facts are disputed or likely to be uncovered by further discovery, allegedly incomplete discovery will not bar summary disposition.

The federal district court granted plaintiff's request for discovery, with limitations, and its order is the only limitation on discovery contained in the whole of the lower court record. Although plaintiff argued below that she was precluded from discovering the subjective intents of the officers, prior relationships between the officers and the decedent, and facts surrounding defendant Burmeister's decision to rejoin the chase after having been instructed to return to Menominee, plaintiff also admitted that she did not know "what other

facts are out there . . . because [she had not] had an opportunity to explore them." On appeal, plaintiff simply states that "in this case, a fair chance of uncovering factual support existed if discovery was conducted."

As part of her federal case, plaintiff was afforded two hours of deposition time for each defendant in which she was permitted—by counsel for defendants if not by the district court's order—to explore any topic she desired.[3] In fact, she specifically asked about the officers' prior contacts with VanVorous, contrary to her claim that she was prohibited from doing so. Plaintiff does not explain how she was prevented from conducting further discovery during the course of her state case, and we note that she had approximately six months between the time she filed her complaint and the time defendants' motion for summary disposition was heard to proceed.

But even if plaintiff should have been granted additional time for discovery, plaintiff was required to articulate the support she had for her allegations regarding a factual dispute. See *Bellows v Delaware McDonald's Corp*, 206 Mich App 555, 561; 522 NW2d 707 (1994) (holding that where "a party opposes a motion for summary disposition on the ground that discovery is incomplete, the party must at least assert that a dispute does indeed exist and support that allegation by some independent evidence"). Here, plaintiff provides no basis on which this Court could conclude that further discovery stood a reasonable chance of uncovering factual support for her position. See *Colista v Thomas*, 241 Mich App 529, 537-538; 616

---

[3] During defendant Anderson's deposition, plaintiff's counsel commented, "I guess I can discuss what I want, in my two hours." Counsel for defendant did not negate plaintiff's impression, and in no deposition did counsel make any objections to plaintiff's lines of questioning.

NW2d 249 (2000). A mere promise that facts will be established is not sufficient. *Maiden, supra* at 121.

Plaintiff's sole complaint regarding this issue appears to be that she was prohibited from exploring "personal relationships" between defendants and the decedent or the subjective intents of the officers at the scene. As noted, plaintiff did indeed explore those topics when she deposed the officers. But in any event, plaintiff did not explain below, and does not explain on appeal, what material facts are disputed or are likely to be found by additional discovery. Instead, she stated only that discovery was not as "full and complete" as it would have been under the Michigan Court Rules and that she could not explain what other facts were yet to be uncovered because she had not been able to explore them. Although *Bellows* only requires "some" independent evidence that a dispute exists, *Bellows, supra* at 561, plaintiff does not provide any.

Thus, because plaintiff does not explain what facts are in dispute or what facts are expected to be uncovered by further discovery, the fact that discovery may have been incomplete did not preclude summary disposition.

### B. COLLATERAL ESTOPPEL

Plaintiff next argues that collateral estoppel should not apply because her federal court claims are different than those in the present case. But as will be explained, we believe plaintiff misinterprets the rules surrounding collateral estoppel and mistakenly argues that because her *claims* are different—rather than her *issues*—collateral estoppel should not apply.

Collateral estoppel precludes relitigation of issues between the same parties. *Jones v Chambers*, 353 Mich

674, 680-681; 91 NW2d 889 (1958). Where " 'a question of fact essential to the judgment [has] been actually litigated and determined by a valid and final judgment,' " collateral estoppel bars a litigant from pursuing the same issue again. *Monat v State Farm Ins Co,*469 Mich 679, 682; 677 NW2d 843 (2004), quoting *Storey v Meijer, Inc,* 431 Mich 368, 372, 373 n 3; 429 NW2d 169 (1988). Moreover, " 'the same parties must have had a full [and fair] opportunity to litigate the issue' " and " 'there must be mutuality of estoppel.' " *Id.* at 682-684, quoting *Storey, supra* at 373 n 3. " '[M]utuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action.' " *Id.* at 683-684, quoting *Lichon v American Universal Ins Co,* 435 Mich 408, 427; 459 NW2d 288 (1990). In disputing the trial court's dismissal of her claims, plaintiff argues only that the issue in the federal action was not the same as the issues in the present action.

All parties agree that the ultimate issue considered in the federal court was whether defendants' actions were objectively reasonable under the circumstances pursuant to the Fourth Amendment. The parties also agree that government employees are generally not protected against liability for intentional torts, *Sudul v Hamtramck,* 221 Mich App 455, 458; 562 NW2d 478 (1997), but that if the acts that are purportedly intentional torts were justified, governmental immunity applies. *Brewer v Perrin,* 132 Mich App 520, 528; 349 NW2d 198 (1984).

It is well-settled in our state's jurisprudence that "a police officer may use reasonable force when making an arrest." *Id.,* citing *Firestone v Rice,* 71 Mich 377; 38 NW 885 (1888), and 35 CJS, False Imprisonment, § 25, pp

657-660. The force reasonably necessary to make an arrest is "the measure of necessary force [] that [] an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." *Brewer, supra* at 528. Thus, the standard is an objective one under the circumstances. Having set forth the general rules governing the overarching issue for each of plaintiff's intentional tort claims, we turn now to the individual causes of action.

### 1. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

As is often noted, our Supreme Court has not officially recognized the tort of intentional infliction of emotional distress. See *Smith v Calvary Christian Church*, 462 Mich 679, 690; 614 NW2d 590 (2000) (WEAVER, J., concurring), citing *Roberts v Auto-Owners Ins Co*, 422 Mich 594; 374 NW2d 905 (1985). Assuming that the cause is valid, recovering for the tort requires a plaintiff to prove the following elements: "(1) 'extreme and outrageous' conduct, (2) intent or recklessness, (3) causation, and (4) 'severe emotional distress.' " *Roberts, supra* at 602, quoting Restatement Torts, 2d, § 46, p 71. Whether the offending conduct is extreme and outrageous is initially a question of law for the court. *Sawabini v Desenberg*, 143 Mich App 373, 383; 372 NW2d 559 (1985), citing *Roberts*.

The threshold for showing extreme and outrageous conduct is high. No cause of action will necessarily lie even where a defendant acts with tortious or even criminal intent. *Roberts, supra* at 602, citing Restatement Torts, 2d, § 46, comment d, pp 72-73. Rather, liability is imposed only where " 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community.' " *Roberts, supra* at 603, quoting Restatement Torts, 2d, § 46, comment d, pp 72-73.

Here, in the face of the district court's determination that defendants' conduct was reasonable or, at the very least, the result of a reasonable mistake, plaintiff could not, as a matter of law, succeed in showing that the conduct was simultaneously extreme and outrageous. For plaintiff to pursue her claim would require relitigating where on the spectrum of reasonableness defendants' actions fell. Under Michigan law, the officers pursuing VanVorous were entitled to use the amount of force that was objectively reasonable under the circumstances. *Brewer, supra* at 528. Similarly, the "objective reasonableness" standard applied by the federal court also concerned the reasonableness of the conduct from the perspective of an objective police officer under the totality of the circumstances at the time. *VanVorous, supra* at *13-*28; *Graham, supra* at 395-397. Thus, when the federal court reached and decided the question in defendants' favor, and the conduct element of plaintiff's intentional infliction of emotional distress claim is based on the identical question of fact litigated in the district court, the trial court correctly concluded that collateral estoppel barred plaintiff's claim of intentional infliction of emotional distress.

### 2. ASSAULT AND BATTERY

For the same reasons, plaintiff's assault and battery claims were also collaterally estopped. To recover civil damages for assault, plaintiff must show an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish

the contact." *Espinoza v Thomas*, 189 Mich App 110, 119; 472 NW2d 16 (1991), citing *Tinkler v Richter*, 295 Mich 396, 401; 295 NW 201 (1940), and Prosser, Prosser & Keeton, Torts (5th ed), § 9, p 39. To recover for battery, plaintiff must demonstrate a "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Thomas, supra* at 119, citing *Tinkler, supra,* and Prosser, *supra.*

But again, government actors may find it necessary —and are permitted—to act in ways that would, under different circumstances, subject them to liability for an intentional tort. To find for plaintiff on these claims, our courts would have to determine that the officers' actions were not justified because they were not objectively reasonable under the circumstances. *Brewer, supra* at 528. Because the federal district court reached and decided the question, further litigation regarding this issue was collaterally estopped.

### 3. GROSS NEGLIGENCE

In her allegations pertaining to this count of her complaint, plaintiff claimed that defendants "undertook the obligation to properly perform their duties to ensure the safety of all parties during the chase and subsequent attempted apprehension of Mr. VanVorous," and that defendants "breached the duty of care they owed to Mr. VanVorous by utilizing excessive force to subdue or control Mr. VanVorous and failing to follow proper police procedure in apprehending him." Thus, plaintiff's claim of gross negligence is fully premised on her claim of excessive force. As defendants correctly note, this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence. *Smith v Stolberg*, 231 Mich App 256,

258-259; 586 NW2d 103 (1998); *Sudul v Hamtramck*, 221 Mich App 455, 458, 477; 562 NW2d 478 (1997). Thus, plaintiff did not state a claim on which relief could be granted. MCR 2.116(C)(8). Moreover, unveiling plaintiff's true claim of excessive force leads to the inevitable conclusion that the claim is also collaterally estopped.

### IV. CONCLUSION

Because plaintiff failed to present any independent evidence that a factual dispute existed, the trial court correctly granted summary disposition despite the fact that plaintiff desired to engage in further discovery. Moreover, plaintiff's claims for intentional infliction of emotional distress and assault and battery were collaterally estopped because to succeed on her claims would have required plaintiff to relitigate the reasonableness of defendants' actions, a matter previously litigated in federal court. Last, because plaintiff's claim of gross negligence disguises her true claim of excessive force, also already litigated, the trial court correctly granted summary disposition.

Affirmed.