*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RICHARD KEVIN STEIGER,

        Plaintiff-Appellee,

v

ROBERT HAHN, MICHAEL A. CALDWELL, PATRICK BOYD, DELMAR PUTNAM, KEN MILLS, JR., and ALAN BURKE,

        Defendants-Appellants

and

BRADLEY SZATKOWSKI,

        Defendant.

UNPUBLISHED
November 14, 2019

No. 345677
Alpena Circuit Court
LC No. 16-007474-CZ

Before: O'BRIEN, P.J., and GADOLA and REDFORD, JJ.

PER CURIAM.

Defendants-appellants, six officers and officials of the Michigan State Police (MSP), appeal as of right the trial court's order denying their motion for summary disposition on grounds of governmental immunity.[1] We reverse.

## I. FACTS

This case arises from an unsuccessful attempt to prosecute plaintiff for fraudulently obtaining controlled substances. See MCL 333.7407(1)(c). Plaintiff earlier filed an action in

---

[1] The trial court dismissed the only defendant who was not affiliated with the MSP, Bradley Szatkowski, who is not participating in this appeal.

-1-

federal court against the police officers involved in the investigation, setting forth claims under 42 USC 1983 of unreasonable seizure without probable cause, malicious prosecution, retaliation for exercising First Amendment rights, and violation of Fourteenth Amendment due process, along with a state-law claim of gross negligence. The federal court granted summary judgment to defendants. In its opinion and order granting summary judgment, the federal court summarized the underlying facts as follows:

> Plaintiff Richard Steiger [at the relevant time was] the County Prosecutor for Presque Isle County. . . . Defendant Michael A. Caldwell is Inspector-Assistant Commander of the Seventh District for the Michigan State Police (MSP). Defendant Patrick Boyd is a supervisor with the Michigan State Police who is assigned to the Seventh District Task Force. Defendant Delmer Putnam is a retired Michigan State Police detective-lieutenant. In late 2011 and early 2012, Putnam was assigned to and commanded the Huron Area Narcotics Team (HUNT). Defendant Ken Mills, Jr., is a detective-lieutenant assigned to Straights Area Narcotics Enforcement (SANE). Defendant Bradley Szatkowski is a police officer employed by the Presque Isle Sheriff's Department. Defendant Alan Burke retired from the Michigan State Police in February 2012. In late 2011 and early 2012, Burke was a trooper assigned to the Alpena MSP post.

> A.

> Steiger's allegations regarding his history of medical issues and pain management are uncontested. Steiger underwent a nasal surgery in 1993. That surgery was mishandled and resulted in Steiger facing "continuous pain and discomfort" as well as chronic "sinusitis and migraine headaches." On September 11, 2011, Steiger underwent outpatient surgery . . . for treatment of "a substantial gluteal [abscess]." Steiger was prescribed pain relievers for the pain resulting from the surgery.

> Because Steiger was undergoing medical treatment for the [abscess], he asked his ex-wife, Kirah Steiger, to take care of their children for several days while he recovered. Kirah agreed and took the children to Steiger's home so they could collect their belongings. Because Ms. Steiger was suspicious that Steiger was abusing pain medication . . . she searched Steiger's home for medication. Ms. Steiger discovered two bottles of medication and a bottle that contained white powder. . . .

> After the search, Ms. Steiger contacted HUNT, a multi-jurisdictional task force that investigated narcotics offenses in the area and operates under MSP oversight. . . . Ms. Steiger contacted Defendant Burke, who gave her the contact information for Detective Hahn. Ms. Steiger then met with Hahn [and] gave Hahn the substance she had taken from Steiger's home. Ms. Steiger informed Hahn that she believed the substance was ground up Percocet and that Steiger was getting prescriptions for narcotic pain medication from multiple doctors. Hahn indicated he would run a [Michigan Automated Prescription System (MAPS)] report and wondered whether Steiger was doctor shopping. Ms. Steiger

-2-

responded: "He is, yeah. He is doctor shopping. It's going to be Kiel and Coombs." Hahn then replied . . . "[Y]ou can have a problem there, particularly if you are . . . playing them off of each other, but typically a good doctor shopping case would require at least three, four, maybe five . . . ." Hahn kept the bottle of Percocet and initiated a criminal investigation into Steiger's prescription drug use. Ms. Steiger agreed to become a confidential informant.

B.

On September 20, 2011, Detective Szatkowski ran a MAPS report at Hahn's direction. Hahn summarized the report:

> The M.A.P.S. report revealed that in the year 2010, Steiger was issued a total of 1,840 units of Oxycodone/Oxycontine of varying milligram strengths and consistencies, as well as 2,075 units of Hydrocone of varying milligram strengths and consistencies. In the year 2011, the amounts were 1,868 units of Oxycodone/Oxycontine and 650 units of Hydrocone. Based upon the enormous amounts of Hydrocone and Oxycodone/Oxycontine being prescribed to Steiger in the last two years, it is unlikely that the prescribing physicians involved in Steiger's medical treatment are aware of one-another. Or, at the very least, are aware that the others are prescribing controlled substances to him in addition to that which they are prescribing.

Hahn further highlighted seven specific periods of time where Steiger obtained multiple prescriptions for similar or identical drugs within a short period of time and from different doctors.

On September 26, 2011, HUNT turned over the investigation to SANE, another multijurisdictional narcotics task force that typically conducts investigations in nearby counties. The investigation was transferred because Steiger was a prosecuting attorney in one of the counties covered by HUNT and because Steiger was on HUNT's board of directors. Detective Mills led the investigation for SANE. At Mill's request, HUNT officers assisted SANE in the investigation by executing search warrants and interviewing witnesses.

On October 3, 2011, Assistant Attorney General Richard Cunningham sent a letter to Dr. Kirk C. Mills at Detroit Receiving Hospital which included Steiger's MAPS report. . . . Cunningham requested that Dr. Mills provide an "expert medical opinion" on whether "there is probable cause to believe that a person's medical records will provide evidence that a crime has occurred." Mr. Cunningham explained that the investigators were working under the theory that if there were no notes on the medical records indicating that Steiger informed his doctors he was receiving other prescriptions, that "would be evidence that the patient never told the provider about any other prescriptions." Mr. Cunningham

asked Dr. Mills whether it was "likely that any physician would have prescribed the controlled substances prescribed by other physicians so close in time."

On October 22, 2011, Dr. Mills reported . . . that Steiger's "pattern of obtaining pain medication from two different physicians and using multiple pharmacies to get them filled it [sic] is completely consistent with drug abuse, misuse, or diversion." Further, Dr. Mills explained that Steiger's "pattern of obtaining medications earlier than predicted based on the quantity described is consistent with drug misuse, abuse, and/or diversion." Dr. Mills asserted that Steiger should have had dozens, if not hundreds, of unused pain tablets left over because of the frequency with which his medication was changed, and that "[l]egitimate chronic pain patients typically inform their prescribing physician that they still have tablets left over." Finally, Dr. Mills explained that both of Steiger's doctors "over prescribed pain medication" and that it was likely that neither checked Steiger's MAPS records. Dr. Mills also explained that there "were obvious oversights by some of the pharmacies utilized" by Steiger. On January 24, 2012, Dr. Mills sent a notarized letter to Mr. Cunningham attesting that his medical expert opinion in the October 22, 2011, letter was entirely the result of Dr. Mills's "own independent study and analysis."

C.

Investigators then prepared search warrants for eleven medical facilities and pharmacies, including the medical offices of Dr. Robert Coombs and Dr. Jeffrey Kiel, the two doctors who prescribed almost all of Steiger's pain medication.

On October 25, 2011, Mills and Detective Rundstrom interviewed Dr. Kiel. Dr. Kiel informed the officers that Steiger had informed him he was receiving Oxycontine prescriptions from another doctor. According to Dr. Kiel, he recommended that Steiger begin treatment at a pain clinic, which resulted in Steiger's relationship with Dr. Coombs. However, Dr. Kiel did not know that Steiger was receiving Oxycodone and Percocet from Dr. Coombs. Dr. Kiel had not run a MAPS for Steiger. Although Dr. Kiel was surprised that Steiger was receiving so much medication from Dr. Coombs, Dr. Kiel admitted that he likely did not document whether Steiger misrepresented his prescriptions from Dr. Coombs. However, Dr. Kiel did suggest that Steiger "probably [has] got a problem and it looks like it's getting the better of him."

While Dr. Kiel was interviewed, Hahn and Putnam simultaneously questioned Dr. Coombs. When asked whether he was aware that Steiger was seeing other doctors, Dr. Coombs indicated he was not [and] explained that if he had learned that Steiger was getting prescriptions from other physicians, he would have discharged Steiger from his practice. Dr. Coombs indicated that all of his patients sign a contract . . . in which they promise not to "attempt to obtain any controlled medicines . . . from any other doctor." The officers asked whether Dr. Coombs had ever run a MAPS on Steiger, and Dr. Coombs indicated that his

office had not, likely because Steiger was a prosecuting attorney. After the officers showed him Steiger's MAPS report, Dr. Coombs indicated that the behavior on the report would typically be grounds for discharging a patient from the practice and that he would no longer provide prescriptions for Steiger. Dr. Coombs further explained that "I don't even think I've had people I have kicked out that have been this bad," [but] did admit that he likely did not ask Steiger whether he was receiving narcotics from other doctors. . . .

Also on October 25, 2011, Mills and Detective Rundstrom interviewed Steiger at his home. Steiger was shocked by the allegations and fiercely disputed the assertion that he was doctor shopping or defrauding his doctors. He asserted that Dr. Kiel was his primary care physician, that Dr. Coombs was his pain care physician, and that both were aware of what the other was prescribing. He firmly denied addiction.

Finally, Mills, Putnam, Caldwell, Presque Isle County Sheriff Paschke, and a Presque Isle County assistant prosecutor met on October 25, 2011, to discuss the status of the investigation. Mills indicated to the group that he thought the case against Steiger was weak[, but] later testified that the case became stronger after medical records were obtained and Steiger's doctors were further interviewed.

On October 31, 2011, Dr. Coombs was interviewed again by Hahn. The two discussed Dr. Coombs['] medical records relating to Steiger's treatment [and] agreed that the records indicated that Steiger had disclosed at least some of the medication he was receiving from Dr. Kiel. The two [also] agreed that, although Steiger had disclosed that Dr. Kiel was prescribing Narco to him, he did not disclose Dr. Kiel's Percocet prescriptions. Dr. Coombs asserted that he had told Steiger to stop taking some of the pain medication . . . from Dr. Kiel [and] further told Steiger to stop getting Norco and Percocet . . . from Dr. Kiel. Dr. Coombs never expressly authorized Steiger to obtain duplicate prescriptions of pain medication from Dr. Kiel. In fact, Dr. Coombs indicated that if he had realized Steiger was getting similar medication from two sources, he would have quickly put a stop to it. Finally, Dr. Coombs recounts a conversation he had with Steiger after the allegations of fraud arose. In that conversation, Steiger told Dr. Coombs that he had made full disclosure. Dr. Coombs responded by saying: " 'It's not full disclosure when you get a medication from me and then you go to another doctor and you get the identical medication.' "

On November 14, 2011, Mills interviewed Physician's Assistant Jeffery Kwiatkowski, who prescribed twenty Percocet pills to Steiger during an emergency room visit in September 2011. Kwiatkowski indicated that he had not run a MAPS report for Steiger, but believed that doing so was unnecessary because Steiger was a prosecuting attorney and had reasons for his pain complaints. Kwiatkowski further indicated that Steiger disclosed that he was receiving pain medication from other doctors, but did not disclose the amounts.

Kwiatkowski said he likely would not have prescribed additional Percocet if he knew the amount of pills Steiger had already been prescribed.

Also on November 14, 2011, Mills interviewed Dr. Kiel for a second time. Dr. Kiel told Mills that Steiger "did misrepresent himself" on at least one occasion because "there is no way [Dr. Kiel] would have given" additional medication so soon after Steiger received similar medication from Dr. Coombs. According to Dr. Kiel, Steiger would consistently ask for refills of his prescriptions early. Further, Dr. Kiel asserted that, even though Steiger had disclosed that he was getting prescriptions from another doctor, Steiger was "being deceptive." Steiger told Dr. Kiel that Dr. Coombs had authorized Dr. Kiel to prescribe pain medication for Steiger's migraines. Dr. Kiel accepted Steiger's representation and thus prescribed pain medication without talking independently with Dr. Coombs. . . .

D.

On December 16, 2011, Putnam and Mills met with members of the Attorney General's office, including Richard Cunningham. . . . Mr. Cunningham told the investigators that the Attorney General's office would review the findings and determine whether to file charges. On December 18, 2011, Mr. Cunningham told Mills that Steiger would be charged with one count of obtaining prescription narcotics by fraud. On December 19, 2011, Mills sent an email to Mr. Cunningham requesting an arrest warrant for Steiger. Daryl Vizina, the [then] elected prosecutor for Cheboygan County, asserts that Mills told him after Steiger's arrest that Mills was surprised the charges had been brought because it was not "a great case." On December 21, 2011, Hahn sent a letter to Mr. Cunningham which . . . stated that "the sensitive nature of this investigation is quite the departure from our normal routine here in North Eastern Michigan, and when made public, will have a negative impact on the public's faith in Mr. Steiger's office. I believe that this impact will be short-lived and that the citizens of Presque Isle County will one day . . . be thankful that Mr. Steiger's actions were uncovered."

On January 24, 2012, and February 2, 2012, a preliminary examination was conducted in the 88th District Court. Judge Theodore Johnson asserted that although Steiger had obtained a tremendous amount of pills over the period of time in question, he was not charged with prescription drug abuse. Rather, he was charged with fraudulently obtaining prescriptions. Judge Johnson concluded that Mr. Steiger did not make misrepresentations to his physicians. Rather, every time Steiger saw Dr. Coombs, he filled out a form indicating he was receiving medication from another doctor. Likewise, Dr. Kiel knew that Dr. Coombs was prescribing pain medication. Accordingly, Judge Johnson found that the government had not shown probable cause of fraud sufficient to bind the case over for trial.

The state appealed the district court's decision. Circuit Judge Michael G. Mack denied the prosecution's appeal. He reasoned that fraud can be both actual and constructive. Accordingly, the question was whether Steiger had shielded himself from criminal liability by disclosing his treatment regimen. Judge Mack admitted that there was ambiguity as to whether a constructive fraud theory would justify binding over the matter for trial, but found that, under an abuse of discretion standard, there was no reason to "second-guess the determination of the district court." In fact, Judge Mack reasoned that "to put him in criminal jeopardy would be to effectively hold him criminally accountable for his physician's negligent review of his medical records." He further found that the conclusory statements by Dr. Coombs and Dr. Kiel were self-serving.[2]

E.

Steiger contends that the case was investigated and prosecution was brought in this case because he had criticized HUNT officers, including Caldwell, Hahn, Boyd, and Putnam, for engaging in unlawful actions. Specifically, Steiger believes that Caldwell retaliated against Steiger because Steiger publically alleged that Caldwell improperly pressured investigators to close an investigation into whether Caldwell's son was guilty of home invasion and criminal sexual conduct. An internal affairs investigation . . . concluded that the case was properly closed because none of the victims wanted to pursue charges. Steiger has also criticized Hahn because, in Steiger's opinion, HUNT officers were inappropriately intimidating suspects, releasing deceptive press releases, and requesting Steiger to prosecute blatantly unconstitutional cases. [*Steiger v Hahn*, Case No. 15-CV-12627 (ED Mich, 2016), pp 1-11 (record citations and footnote omitted; some alterations in original), aff'd 718 F Appx 386 (CA 6, 2018).]

Upon the conclusion of the criminal proceedings against him, plaintiff commenced an action against the involved police officers, including the instant defendants, in the federal district court. The MSP defendants in that case—the same six defendants here—moved for summary judgment. The court granted the motion, concluding that "[e]ven construing the facts in a light most favorable to [plaintiff], a reasonable officer could have concluded that probable cause existed." *Id.* at 15. The court noted that the decision against binding plaintiff over for trial was not dispositive because "the existence of probable cause must be determined without the benefit of hindsight." *Id.* The court dismissed all of plaintiff's federal claims with prejudice, but declined to exercise supplemental jurisdiction over the state-law claim of gross negligence and so dismissed that claim without prejudice. *Id.* at 21-22.

In affirming the district court's decision, the Sixth Circuit Court of Appeals noted that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the

---

[2] This Court denied leave "for lack of merit in the grounds presented." *People v Steiger*, unpublished order of the Court of Appeals entered March 5, 2013 (Docket No. 310680).

law,'" and concluded that, "[t]hough evidence supporting fraud might have been murky due to ambiguity in the doctors' testimony, in the absence of evidence of deliberate or reckless falsehoods, these officers could rely on the AG's Office's independent judgment that probable cause existed to charge Steiger." *Steiger*, 718 F Appx 386, 391 (CA 6, 2018), quoting *Malley v Briggs*, 475 US 335, 341; 106 S Ct 1092; 89 L Ed 2d 271 (1986). The federal appellate court also approved of the lower court's decision not to exercise jurisdiction over the state-law gross negligence claim. *Steiger*, 718 F Appx at 392.

After the federal district court dismissed plaintiff's state-law claim, plaintiff brought this gross negligence action in the Alpena Circuit Court. Defendants filed a motion for summary disposition under MCR 2.116(C)(7) ("prior judgment, immunity granted by law"), (C)(8) (failure to state a claim), and (C)(10) (failure to establish the existence of a genuine issue of material fact). The trial court entered a stipulated order staying proceedings in deference to the appeal of the federal case then pending in the Sixth Circuit.

On January 3, 2018, the Sixth Circuit affirmed the decision of the district court in its entirety. *Steiger*, 718 F Appx 386. Defendants then filed a supplemental brief in this case, urging that plaintiff be "bound by [the federal court's] preclusive determination of the undisputed facts and the underlying legal issues."

The trial court responded with an order directing the parties to file discovery addressing whether defendants were in possession of any exculpatory evidence concerning plaintiff, and if so, what such evidence, if any, was provided to the Attorney General. Plaintiff responded by referring to medical records involving, and interviews with, his treating physicians, statements of defendant Mills to the effect that he did not see merit in the criminal allegations against plaintiff, and the report of the doctor engaged by the Attorney General, Kirk Mills, in which Dr. Mills stated that there was evidence of drug abuse but did not specifically opine that plaintiff had engaged in fraudulent conduct. The trial court thereafter denied defendants' motion for summary disposition without prejudice "pending further discovery on the specific issues listed in this Court's August 21, 2018 order." Defendants now appeal.

## II. GROSS NEGLIGENCE

Defendants argue that the trial court should have granted their motion for summary disposition because plaintiff failed to set forth an actionable claim of gross negligence, and instead tried to revive his failed claims of intentional misconduct by recasting them under a gross-negligence rubric. We agree.

A trial court's decision on a motion for summary disposition is reviewed de novo as a question of law. *Ardt v Titan Ins Co*, 233 Mich App 685, 688; 593 NW2d 215 (1999). Defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10). A motion for summary disposition based on governmental immunity under MCR 2.116(C)(7) is decided by examining all documentary evidence submitted by the parties, accepting all well-pleaded allegations as true, and construing all evidence and pleadings in the light most favorable to the nonmoving party. *Tarlea v Crabtree*, 263 Mich App 80, 87; 687 NW2d 333 (2004). When reviewing an order of summary disposition under MCR 2.116(C)(10), this Court examines all documentary evidence in the light most favorable to the nonmoving party to determine whether

there exists a genuine issue of material fact. *Ardt*, 233 Mich App at 688. In reviewing a (C)(8) motion, this Court accepts as true all factual allegations supporting the claim "to determine whether the claim is so clearly unenforceable as a matter of law that no factual development could establish the claim and justify recovery." *Smith v Stolberg*, 231 Mich App 256, 258; 586 NW2d 103 (1998).

MCL 691.1407(2) provides that every "officer and employee of a governmental agency . . . shall be immune from tort liability for injuries to persons . . . caused by the officer . . . while in the course of employment or service," if that officer "is acting or reasonably believes he or she is acting within the scope of his or her authority," provided that the officer's conduct does not constitute "gross negligence that is the proximate cause of the injury or damage." MCL 691.1407(8)(a) defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

Searching plaintiff's complaint for factual allegations of negligence (gross or otherwise) as opposed to intentional misconduct brings little to light.[3] Plaintiff's gross negligence count asserted generally that defendants "had a duty to perform their employment activities so as not to endanger or cause harm to Plaintiff," that defendants "breached their duty with deliberate indifference and gross negligence and without regard to Plaintiff's rights and welfare, which caused injuries and damages to Plaintiff," and that defendants "knew or should have known that by breaching these duties, harm would come to Plaintiff." But the general factual allegations incorporated by reference into the gross negligence count describe little conduct by defendants that could be characterized as negligent. Instead, several of the allegations tend to establish that defendants had reason to feel hostility toward plaintiff, and that defendants acted deliberately, prompted by their pernicious motives.

Plaintiff correctly concedes on appeal that attempts to litigate claims involving elements of intentional torts under the rubric of gross negligence are highly disfavored. See *VanVorous v Burmeister*, 262 Mich App 467, 483; 687 NW2d 132 (2004) ("this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence"); *Sudul v Hamtramck*, 221 Mich App 455, 459; 562 NW2d 478 (1997) (the trial court erred by instructing a jury that the municipal defendants "could be liable for assault and battery by an act of gross negligence").

Malicious prosecution is an intentional tort. See *Odom v Wayne Co*, 482 Mich 459, 464-465; 760 NW2d 217 (2008); *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App

---

[3] While plaintiff points out that the district court in the original state court proceedings held that there was not probable cause to bind plaintiff over on the brought charge, he advisedly stops short of asserting that this precludes a determination that defendants unreasonably investigated plaintiff, or lacked probable cause to arrest him, in the first instance. As the federal district court noted, the actions of investigating officers should not be viewed with the benefit of hindsight. *Steiger*, Case No. 15-CV-12627, p 14, citing *Michigan v DeFillippo*, 443 US 31, 36; 99 S Ct 2627; 61 L Ed 2d 343 (1979).

363, 372; 838 NW2d 720 (2013).[4]  Defendants contend that "[t]he four corners of the complaint do not paint a picture that some grave mistake was made or that anything was done with a reckless disregard for whether anyone would be harmed. . . .  The gravamen of the complaint is that law enforcement specifically targeted [plaintiff]."  We must agree that plaintiff has overwhelmingly alleged that defendants conspired against him because of personal animosities.  Indeed, plaintiff's final assertion in his complaint is that defendants' "actions were so egregious and so outrageous" as to entitle plaintiff to exemplary damages.  The characterizations "egregious" and "outrageous" comport with allegations of intentional misconduct far better than with allegations of even gross negligence.

Plaintiff argues that a claim relating to police misconduct may alternatively be maintained under the rubric of gross negligence where the challenged conduct does not involve tortious bodily contact.  For this proposition, plaintiff relies on *Bell v Porter*, 739 F Supp 2d 1005 (WD Mich, 2010), where the plaintiff alleged that a Lansing police officer pushed her off a bus and caused her to fall, and claimed excessive force, assault and battery, and gross negligence against the officer; the officer maintained that he was merely trying to create space between them and did not intend to cause the plaintiff to lose her balance.  *Id.* at 1010-1015.  The federal district court noted that the gross negligence claim was predicated on the same conduct that gave rise to the allegations of excessive force and assault and battery, but concluded that gross negligence was a valid alternative because the plaintiff's claim that the offending officer failed to treat her with respect and dignity, to avoid foreseeable injury to her, and to "avoid conduct or a failure to act that is so reckless that it demonstrates a substantial lack of concern for whether an injury will result," did not "rely on an intentional, offensive touching."  *Id.* at 1015, distinguishing *VanVorous*, 262 Mich App 467.

Though this Court is not bound by federal decisions construing Michigan law, see *Allen v Owens-Corning Fiberglas Corp*, 225 Mich App 397, 402; 571 NW2d 530 (1997), even if we were to treat *Bell* as authoritative, it does not rehabilitate plaintiff's gross negligence claim.  In *Bell*, the federal district court observed that the plaintiff's factual account suggested intentional physical aggression against her, while the defendant police officer's account revealed, at worst, some form of negligence.  In contrast, plaintiff identifies no factual issue whose resolution might reveal gross negligence instead of intentional misconduct.  Further, the federal court's concern over whether offensive physical contact took place is better understood as acknowledging the competing factual accounts before it than as recognizing the existence of offensive physical contact as dispositive whether an intentional tort may be characterized as gross negligence.[5]

---

[4]  We recognize that this Court has acknowledged "nonintentional negligent prosecution" resulting from a police officer's selection of facts to include in an incident report, but note that, in doing so, this Court held that such allegations sounded in negligence thus coming under governmental tort immunity, with no suggestion that such an exercise of discretion might ever constitute gross negligence.  *King v Arbic*, 159 Mich App 452, 463; 406 NW2d 852 (1987).

[5]  Plaintiff makes several other assertions that we believe should be briefly addressed.  Plaintiff characterizes defendants' actions as "ultra vires," but that term describes activity that the

Also militating against plaintiff's claim of gross negligence is that liability is confined to "the proximate cause of the injury or damage." MCL 691.1407(2). For this purpose, "the proximate cause" means "the *one* most immediate, efficient, and direct cause preceding an injury." *Robinson v Detroit*, 462 Mich 439, 446; 613 NW2d 307, 311 (2000) (emphasis added). Plaintiff conceded that the assistant attorney general took the initiative to submit plaintiff's MAPS information to an expert for review. Although plaintiff characterized that expert's resulting report as "reckless," he acknowledged that defendant Mills drafted affidavits for search warrants in reliance on that expert's work. Plaintiff additionally asserted that defendants Caldwell and Hahn urged plaintiff's arrest upon the office of the Attorney General, but also that the decision to arrest him for fraudulently obtaining prescription medicines originated in that office. To the extent that plaintiff claims any damages resulting from actions or decisions originating with the office of the Attorney General, that office is "the" proximate cause of them, not the individuals plaintiff named as defendants.

For these reasons, we conclude that the trial court erred by denying defendants' motion for summary disposition predicated on governmental immunity.[6]

## III. COLLATERAL ESTOPPEL

Underscoring the trial court's error is that the earlier federal litigation resulted in several determinations adverse to plaintiff's position that carry through to the instant case through operation of preclusion doctrine.

In particular, collateral estoppel precludes relitigation of an issue in a different, subsequent action between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding. See *Taylor v Sturgell*, 553 US 880, 891-892; 128 S Ct 2161; 171 L Ed 2d

---

governmental actor lacks legal authority to perform, not activity that a governmental actor performs in an unauthorized manner. See *Richardson v Jackson Co*, 432 Mich 377, 387; 443 NW2d 105 (1989). Police officers clearly have the legal authority to investigate whether a consumer of unusually large amounts of controlled substances resorted to fraud to obtain such quantities.

Plaintiff also asserts that defendants "knew or should have known from the medical records they seized from Dr. Coombs and their interviews with Dr. Coombs and Dr. Kiel that [plaintiff] had a history of pain from botched surgery," thus suggesting that persons seeking treatment for bona fide medical conditions cannot reasonably be suspected of resorting to false representations in hopes of obtaining palliative medications. Any such implication is at odds with the common knowledge that some persons resorting to illegal means of obtaining opiates suffer from dependencies that began with legitimate medical prescriptions.

[6] Although the trial court denied defendants' motion for summary disposition "pending further discovery on the specific issues" as set forth in an earlier order, the parties in their briefs on appeal do not suggest that any actual or anticipated further discovery would improve their respective positions.

155 (2008); *People v Gates,* 434 Mich 146, 154; 452 NW2d 627 (1990); 1 Restatement Judgments, 2d, § 27, p 250. Preclusion doctrine applies to state litigation in connection with earlier federal litigation. See *Pierson Sand & Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 382-383; 596 NW2d 153 (1999); *VanVorous*, 262 Mich App at 469; *Howell v Vito's Trucking & Excavating Co*, 386 Mich 37, 41; 191 NW2d 313 (1971).

The propriety of the federal court's decision not to address the merits of the state-law gross negligence claim is not a matter of controversy. See *Pierson Sand & Gravel*, 460 Mich at 382. Nonetheless, collateral estoppel now precludes relitigation of several pertinent issues.

As noted, the federal district court stated that "[e]ven construing the facts in a light most favorable to [plaintiff], a reasonable officer could have concluded that probable cause existed." *Steiger*, Case No. 15-CV-12627, p 15. The court elaborated:

> To begin with, the mere fact that the prosecution was not bound over to trial for lack of probable cause is insufficient to overcome Defendants' qualified immunity. . . . [T]he existence of probable cause must be determined without the benefit of hindsight. Simply because Judge Johnson determined at the preliminary hearing that probable cause was not present does not mean that no reasonable officer could have concluded that probable cause existed. On the contrary, there is sufficient evidence to conclude that probable cause was present. [*Id.*]

In affirming the district court, the Sixth Circuit characterized the district court's probable-cause decision as a "[f]inding that probable cause supported charging and arresting [plaintiff] . . . ." *Steiger*, 718 F Appx at 387.

This determination in the earlier litigation that plaintiff was investigated, charged, and arrested on the basis of probable cause thus carries over into the instant case, through operation of collateral estoppel. Further, instructive for present purposes is the principle that "[p]olice officers' '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.' " *People v Antwine*, 293 Mich App 192, 200-201; 809 NW2d 439 (2011), quoting *Whren v United States*, 517 US 806, 813; 116 S Ct 1769; 135 L Ed 2d 89 (1996).

Bearing on plaintiff's protestations concerning medical records ostensibly withheld in connection with defendant Mills seeking an arrest warrant is the federal district court's observation that "even if the Attorney General's office did not receive the medical records until after December 19, 2011, there is no evidence that those records were not turned over to and reviewed by the Attorney General's office before [plaintiff] was informed of the charges on December 27, 2011." *Steiger*, Case No. 15-CV-12627, p 16. The Sixth Circuit in turn noted that "not only is there no evidence of a decision to withhold the medical records, the record shows that Detective Mills's email to request the arrest warrant includes the express promise to send the medical records—a promise the record confirms he kept when Detective Hahn mailed the medical records." *Steiger*, 718 F Appx at 391. The appellate court further stated:

> Once the police detectives were on to [plaintiff's] prescription history, the rest of the investigation focused on the drug prescribers and any duplicity by [plaintiff]

in his obtaining those prescriptions from them. And pointing to Detective Mills's opinion on the weakness of the fraud evidence gets [plaintiff] nowhere. No such expression of skepticism establishes incompetence or unlawfulness. [*Id.*]

Plaintiff does not suggest that, in its order denying defendants' motion for summary disposition, the trial court's invitation to provide additional discovery concerning withheld exculpatory information has brought or might bring to light anything to call into question the above conclusions. Accordingly, plaintiff's protestations concerning the withholding of ostensibly exculpatory medical records that were unavailing in the federal litigation are not subject to relitigation in this case.

The federal district court also acknowledged "the Attorney General Office's independent review and determination that probable cause to charge existed." *Steiger*, Case No. 15-CV-12627, p 17. The Sixth Circuit likewise held that defendants "could rely on the AG's Office's independent judgment that probable cause existed to charge [plaintiff]." *Steiger*, 718 F Appx at 391. This determination concerning the role of the Attorney General establishes that the Attorney General, not defendants, was the prime mover behind the decisions to charge and arrest plaintiff. Accordingly, as noted earlier, to the extent that plaintiff relies on those actions against him as bases for any claim of damages, the proximate cause must be attributed to the office of the Attorney General, not defendants. See *Robinson*, 462 Mich at 446.

Moreover, the federal district court held that, viewing the facts at the time defendants submitted the case to the Attorney General in a light most favorable to plaintiff, defendants' actions were not "plainly incompetent" or a knowing violation of the law. *Steiger*, Case No. 15-CV-12627, p 18. The Sixth Circuit noted that conclusion with approval. *Steiger*, 718 F Appx at 391. Carrying the factual conclusion that defendants were not "plainly incompetent" in how they developed the case as presented to the Attorney General into the instant case through operation of collateral estoppel defeats a claim that defendants were grossly negligent in the matter.

The trial court thus erred in failing to recognize that several determinations arising from the federal litigation that are not subject to relitigation through operation of collateral estoppel militated against plaintiff's attempt to maintain a cause of action in gross negligence.

For these reasons, we reverse the result below and remand this case to the trial court with instructions to grant summary disposition to defendants and dismiss the case.

Reversed and remanded. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Michael F. Gadola
/s/ James Robert Redford