*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RAMONE THOMPSON,

UNPUBLISHED
September 21, 2023

Plaintiff-Appellee,

v

No. 361316
Wayne Circuit Court
LC No. 20-013624-CZ

CITY OF DETROIT, TIMOTHY SHANK, and
JARED DORMAN,

Defendants-Appellants.

Before: O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

Defendants, the city of Detroit (the city) and Detroit Police Department Officers Timothy Shank and Jared Dorman, appeal the trial court's order denying defendants' motion for summary disposition that was brought pursuant to MCR 2.116(C)(7), (8), and (10). In his lawsuit, plaintiff, Ramone Thompson, alleges misconduct by the two officers when they arrested plaintiff for an alleged assault and battery at a local restaurant. For the reasons set forth in the opinion, we affirm the trial court's ruling with respect to plaintiff's claim of assault and battery against Officers Shank and Dorman. But we reverse the court's ruling in regard to the three remaining claims made against the officers and the city.

## I. FACTUAL AND PROCEDURAL HISTORY

On August 18, 2019, a fight broke out at a Coney Island restaurant in Detroit. According to plaintiff's deposition testimony, "[t]here were some guys in there drunk" who were "talking crazy to everybody." Plaintiff testified that the intoxicated individuals "started getting very loud" and "walked up on" Javonte Stephans, one of plaintiff's friends who was with him. Plaintiff and his brother, who was also present, "walked up and then [everyone] just started fighting." Plaintiff testified that he acted in self-defense during the fight and, more specifically, that he "recall[ed] a guy in front of [him] with his hands balled up about to swing." But then, plaintiff explained, "another guy came and he started shooting [from] outside of Coney Island which hit [Stephans] multiple times." Plaintiff testified that "[o]nce we heard gunshots, we stopped fighting," "looked

-1-

at each other," and "ran" out of there. When plaintiff got outside, he looked through the window and saw Stephans lying on the ground and a male with a gun standing over Stephans. Plaintiff testified that he kind of created a distraction, allowing Stephans to crawl out of the restaurant. Plaintiff helped Stephans into plaintiff's truck and drove him to St. John Hospital.

Two videos of the fight and shooting at Coney Island were available from the restaurant's security cameras. The fight and shooting happened quickly, and, especially without audio, it is difficult to discern whether plaintiff acted in self-defense. But it does not appear that plaintiff threw the first punch. Rather, it appears that an argument started between two groups of people and that plaintiff ran over and joined the fight after the first punch was thrown. The two groups fought for just a few seconds before a man entered the restaurant and immediately fired several gunshots. Stephans, the shooting victim, crawled out of Coney Island less than two minutes after the fight began.

At the hospital, plaintiff was approached by Officers Shank and Dorman in the emergency room's visiting area. Plaintiff testified that the officers asked him about what had transpired at Coney Island and that he gave them all of the details. According to plaintiff, the officers "seemed like they were very helpful and trying to understand what was going on." In their deposition testimony, the officers described the encounter similarly, agreeing that they questioned plaintiff in the hospital's lobby without issue. But a few minutes later, when plaintiff was walking back to the hospital after briefly returning to his vehicle, the officers approached him again and arrested him in the hospital's parking garage. Plaintiff testified, "As we get close to each other, [Officer Shank] grabs my arm and says, 'Put your hands behind your back,' and then another officer comes and grabs my arm."

Officer Shank testified that he received a phone call from Sergeant George O'Gorman, who explained to him that he saw video footage of an assault that occurred at the Coney Island. Sergeant O'Gorman described to Officer Shank one of the males involved in the assault, and this person transported the shooting victim. The description matched plaintiff. Officer Dorman also received a communication from Sergeant O'Gorman regarding the same information. Officer Dorman testified that he personally received a video clip from the Coney Island security camera. According to Dorman, the "instruction [was] to arrest [plaintiff] for assault and battery due to video evidence showing that he had assaulted the . . . shooting victim at Coney Island." Officer Shank testified that they arrested plaintiff after "being advised by Sergeant George O'Gorman that he was good to go for assault and battery."

Officer Shank testified that he told plaintiff "to place his hands behind his back" but that he "did not tell him why." Officer Dorman testified that he could not recall whether Officer Shank ever told plaintiff why he was being arrested, and he acknowledged that he never told plaintiff. Officer Dorman blamed the surrounding circumstances for their failure to tell plaintiff why he was being arrested. Officer Shank, on the other hand, called it intentional, explaining that his "experience as a police officer" led him to believe that telling someone "exactly why they are being arrested" often causes people to "immediately become aggressive and resistant." It was Officer Shank's preference "to get them in handcuffs, get the situation calm first, have them restrained and detained, and then . . . advise them what they're being arrested for." But when asked whether he ever told plaintiff why he was being arrested, Officer Shank indicated that he could not recall whether he had done so.

-2-

Plaintiff likewise testified that the officers never told him that he was under arrest or why he was being handcuffed. Instead, according to plaintiff, "[o]ne of the officers had their [T]aser pointed at [him] and then they said, 'We're going to tell you in a minute.'" Officer Dorman agreed that he "drew [his] [T]aser . . . from its holster and turned it and pointed it at [plaintiff]." Plaintiff testified that the officers "put the handcuffs on [him] very tight instantly" and were "pulling on" him the entire time. Plaintiff also asserted that he immediately complained that "[t]he cuffs were too tight" and asked the officers repeatedly to "loosen the cuffs."

Officer Shank testified that plaintiff became angry, confrontational, took an aggressive stance, tensed his muscles, curled his hands into fists, and repeatedly asking why he was being arrested. Officer Shank explained that he told plaintiff that he would inform him why he was being arrested as soon as plaintiff complied and put his hands behind his back. Plaintiff, however, "remained aggressive," so Officer Shank had to forcefully pull plaintiff's hands behind his back. Officer Dorman similarly testified that plaintiff "resisted by pulling his arms away from Officer Shank." Officer Shank acknowledged that even after handcuffing plaintiff, he did not tell plaintiff why he was being arrested.

Officer Dorman testified that plaintiff repeatedly complained about the handcuffs being too tight, but that he "didn't have an opportunity to" check their tightness and did not know whether Officer Shank checked or double-locked them. Officer Shank acknowledged that he never double-locked the handcuffs or otherwise checked them for tightness, stating that he "did not have the chance to do a tension check or a double lock because [plaintiff] remained aggressive." After conceding that plaintiff "was making complaints about the handcuffs being tight the entire time during the escort," Officer Shank testified that he told plaintiff that he would loosen the handcuffs when they arrived at the patrol car. He did not have the opportunity to do so earlier because he was focused on maintaining control of plaintiff, who was continuing to act in an aggressive manner.

Officer Shank observed that plaintiff "was actually pushing and pulling" as they tried to escort him out of the parking garage. He also indicated that plaintiff was "attempting to trip [him] during the escort" and caused him to "stumble." Officer Dorman similarly testified that plaintiff kept shifting his body and using his weight in his struggle with the officers, causing Officer Dorman to lose "control over him." As the officers led plaintiff out of the parking garage, plaintiff's brother was present recording the events with his phone before he too became embroiled in an altercation with the officers. And Officer Dorman eventually deployed his Taser at plaintiff's brother and arrested him as well.

Plaintiff testified that when he saw Officer Dorman deploy the Taser at his brother, plaintiff attempted to run to his brother's defense. Officer Shank testified that plaintiff was screaming, demanding removal of his handcuffs, and threatening to beat Officer Shank's "mother f*****g ass." When plaintiff tried to run to his brother, Officer Shank "tripped" him, swung him to the ground, and let his "face hit the ground." Officer Shank observed that he never lost his grip on plaintiff. Plaintiff testified that he "just remember[ed] laying there for a minute" and then getting "picked up and . . . walked . . . to the vehicle." Officer Shank indicated that he took plaintiff to the patrol car. Officer Shank was asked whether he ever checked plaintiff's handcuffs after plaintiff was placed in the police car, and the officer responded, "Sir, I told you that I had no contact with him after I placed him in the back of the scout car." But as the prosecution noted, a

backseat camera in the patrol car produced video footage appearing to show that immediately after Officer Shank placed plaintiff in the car, Officer Shank bent over behind plaintiff and adjusted the handcuffs. Although the camera angle does not give us a direct view of what Officer Shank was doing, a ratcheting sound similar to the sound of handcuffs being adjusted can be heard, and plaintiff quieted down.

Officer Shank did not have his bodycam on his person during plaintiff's arrest. He explained that he took it off before entering the hospital and did not go back to retrieve it before arresting plaintiff because "time was of the essence." Officer Dorman, however, had his bodycam on and activated, which produced video footage. The audio begins after approximately 30 seconds, and Officer Dorman is immediately heard threatening to deploy his Taser at plaintiff when plaintiff was initially confronted and arrested in the hospital's parking garage. The videotape shows that Officer Dorman pointed the Taser directly at plaintiff. Plaintiff can be heard complaining several times regarding the tightness of his handcuffs, and he also used vulgar language, expressing a desire to fight the officers throughout the video while asking when they were going to tell him why he was being arrested. Less than two minutes later, the officers encountered plaintiff's friends and brother outside of the garage. As depicted in the video, Officer Dorman deployed his Taser at plaintiff's brother approximately a minute and a half later. Officer Dorman did not return to plaintiff after deploying his Taser at plaintiff's brother. The conduct of plaintiff's brother, as viewed in the video, clearly showed that he was interfering with the officers' actions, and plaintiff's aggressive conduct intensified after his brother became involved.

Sergeant O'Gorman, Officer Shank and Officer Dorman's supervisor, testified that he responded to Coney Island after reports of a shooting that evening. He was not the officer who reviewed the restaurant's surveillance video. Instead, Sergeant O'Gorman testified that Officer Benjamin Wischniewski "had reviewed the video from inside the [C]oney [I]sland" and "had told [him] that [plaintiff] had started a physical fight." Sergeant O'Gorman testified that the information he received from Officer Wischniewski was that plaintiff had initiated the altercation that led to the shooting. Thus, Sergeant O'Gorman agreed that it was "correct" to say that "any arguable probable cause that [he] had was conveyed to [him] by Officer Wischniewski[.]"

Sergeant O'Gorman testified that on the basis of the information that he received from Officer Wischniewski, the "game plan" was for Officer Shank and Officer Dorman to make sure that plaintiff stayed at the hospital. Sergeant O'Gorman further testified that "we weren't planning on at the time, 100 percent, making an arrest because it's easier to talk to somebody as a witness when they're not in custody and they're usually more willing to talk about the events that led up to what happened." But ultimately, Sergeant O'Gorman explained, "we did have enough from the information I had, if he didn't want to stay and cooperate, to lock him up for assault and battery, so that we could still maintain him as a witness." When asked whether the arrest and handcuffing were a last resort, Sergeant O'Gorman stated that it was a last resort "if . . . we had no other options to maintain him there."

Sergeant O'Gorman testified that he was on his way to the hospital to give Officers Shank and Dorman some assistance when Officer Dorman called for more units. Sergeant O'Gorman explained that when he arrived at the hospital, he first checked on plaintiff's brother to see if he needed medical attention and to remove the Taser prongs. Sergeant O'Gorman then talked to Officer Shank before speaking with plaintiff. Sergeant O'Gorman testified that he spoke with

plaintiff about what had transpired between plaintiff and the officers. Plaintiff acknowledged that once he was in the police car, Sergeant O'Gorman had asked him questions and basically wanted to know what had happened.

According to Sergeant O'Gorman, when asked if he had any injuries, plaintiff indicated that he had a dislocated right shoulder. Plaintiff contended that the shoulder injury impacted his ability to sleep and drive. Plaintiff maintained that he was in pain during the entire episode. Plaintiff testified that his back was hurt and that he ended up with a small scab on his face. Plaintiff claimed that he suffered from headaches and mental health issues after and as a result of the incident. With respect to being handcuffed, plaintiff asserted that he sustained small cuts around his wrists, some minor bleeding in the wrist area, and a numbness sensation of his wrists that "was constant for months" and lasted a long time. Plaintiff testified that he was still experiencing some "complications" from his injuries at the time of his deposition on October 4, 2021. Plaintiff videotaped the alleged injuries to his wrists a few days after the arrest. The videotape appears to depict some small cuts to his wrists. Law enforcement took plaintiff to a different hospital to have his injuries examined and treated. Medical records revealed that plaintiff complained of right shoulder pain, but that "he denie[d] any pain in his hand, wrist, or elbow." There are no medical records showing injury to plaintiff's wrists.

Plaintiff testified that when he was sitting in the police car after being arrested, he heard an officer use a racial slur, i.e., f*****g n*****s. Officers Shank and Dorman denied using a racial slur. In another officer's bodycam footage, one can hear remarks by plaintiff and the officer who escorted plaintiff to the police car, Officer Shank. Plaintiff can be heard complaining that no one would tell him what was going on, that his handcuffs were too tight, and that police officers should not walk up to someone and say "put your hands behind your back" without telling them why. Shortly after plaintiff was placed in the police car, an officer can be heard saying "f*****g" followed by another word, which, to us, sounds like "n****r." It appears that the possible racial slur was made by Officer Shank, although we cannot say so with certainty as multiple officers were milling about. As further gleaned by the bodycam footage, the same officer then says "those f*****g goddamned" something. No racial slurs are heard on Officer Dorman's bodycam, but he does call plaintiff's friends and brother "dickheads."

Plaintiff was not charged with any crimes arising out of the fight and shooting at Coney Island. He was, however, charged with three various counts of resisting and obstructing connected to his encounter with Officers Shank and Dorman at the hospital. But, in March 2020, a jury found him not guilty on all three counts.

Seven months later, plaintiff filed the instant lawsuit, alleging claims of assault and battery (intentional tort), false arrest/imprisonment (intentional tort), gross negligence, and, as to the city, constitutional violations. Following discovery, defendants moved for summary disposition with respect to all four counts pursuant to MCR 2.116(C)(7), (8), and (10). Defendants argued that summary disposition was proper under MCR 2.116(C)(7) on the basis of governmental immunity with respect to the intentional tort and gross negligence claims. Defendants also contended that summary disposition was appropriate under MCR 2.116(C)(8) with regard to the claim of gross negligence because it was fully premised on intentional conduct. Finally, with respect to MCR 2.116(C)(10), defendants argued that the intentional tort claims failed because there was an absence of evidence on the elements of the torts, that the gross negligence claim failed because

there was no evidence of grossly negligent conduct, and that the constitutional claim against the city failed because there was no evidence that the city had a policy or practice that resulted in a violation of plaintiff's constitutional rights.

In response, plaintiff first argued that the officers were not entitled to governmental immunity because they did not act in good faith and because their actions were otherwise malicious and unlawful. Next, plaintiff contended that there was more than enough evidence to create a genuine issue of material fact with respect to his intentional tort claims. Furthermore, plaintiff maintained that his gross negligence claim was not premised on intentional conduct and was supported by sufficient evidence. Finally, plaintiff argued that his constitutional rights were violated because the officers used unreasonable force and lacked probable cause to arrest him, which conduct was the result of inadequate training by the city.

A hearing on the motion for summary disposition was held on April 27, 2022. After entertaining the parties' arguments, the trial court ruled from the bench. The trial court concluded that multiple issues of material fact existed. The court stated that "[t]he bottom line is that I'm seeing a whole bunch of fact questions here. A whole lot of them, not just one, multiple, and that's the bottom line." Among other evidence, the trial court pointed to the officers' demeanor, their failure to tell plaintiff why he was being arrested, the fact that they handcuffed him without ensuring that the cuffs were not too tight even after plaintiff claimed that they were too tight, the fact that the officers could have loosened the handcuffs at any time, Officer Dorman's act of pointing the Taser at plaintiff's chest, and "the derogatory remarks" by at least one officer. According to the trial court, the situation may have resulted in a completely different outcome had the officers simply informed plaintiff that he was under arrest for an assault and battery at Coney Island. On April 28, 2022, the trial court entered an order denying the motion for summary disposition. This appeal ensued.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). "Further, the determination regarding the applicability of governmental immunity and a statutory exception to governmental immunity is a question of law that is also subject to review de novo." *Snead v John Carlo, Inc*, 294 Mich App 343, 354; 813 NW2d 294 (2011).

### B. SUMMARY DISPOSITION PRINCIPLES

Summary dismissal of a claim is appropriate when a defendant enjoys "immunity granted by law." MCR 2.116(C)(7). In *RDM Holdings, Ltd v Continental Plastics Co*, 281 Mich App 678, 687; 762 NW2d 529 (2008), this Court discussed (C)(7) motions, explaining:

> Under MCR 2.116(C)(7) . . ., this Court must consider not only the pleadings, but also any affidavits, depositions, admissions, or other documentary evidence filed or submitted by the parties. The contents of the complaint must be accepted as true unless contradicted by the documentary evidence. This Court must

consider the documentary evidence in a light most favorable to the nonmoving party. If there is no factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide. If a factual dispute exists, however, summary disposition is not appropriate. [Citations omitted.]

A motion brought under MCR 2.116(C)(8) tests the legal sufficiency of a plaintiff's claim as based on an examination of the factual allegations contained in the complaint. *Esurance Prop & Cas Ins Co v Mich Assigned Claims Plan*, 507 Mich 498, 508; 968 NW2d 482 (2021). A trial court may only consider the pleadings when rendering a decision under MCR 2.116(C)(8). *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). The trial court must accept as true all factual allegations when ruling on the motion. *Esurance Prop*, 507 Mich at 508. A court may only grant a motion under MCR 2.116(C)(8) when a claim is so clearly unenforceable that no factual development of the case could possibly justify recovery by the plaintiff. *Id.*

In *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506-507; 991 NW2d 230 (2022), this Court set forth the guiding principles in analyzing a motion brought pursuant to MCR 2.116(C)(10):

MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).

A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. Speculation is insufficient to create an issue of fact. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. [Quotation marks, citations, and brackets omitted.]

## C. DISCUSSION AND RESOLUTION

## 1. PLAINTIFF'S INTENTIONAL TORT CLAIMS

We initially note that "the burden . . . fall[s] on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense." *Odom v Wayne Co*, 482 Mich 459, 479; 760 NW2d 217 (2008). If a plaintiff pleads an intentional tort against a governmental employee, the defendant employee is entitled to individual governmental immunity by showing the following:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

> (b) the acts were undertaken in good faith, or were not undertaken with malice, and

> (c) the acts were discretionary, as opposed to ministerial. [*Id.* at 480.]

Of these three elements, the only one at issue in this case concerns whether the officers' acts were undertaken in good faith and not with malice. There can be "no immunity when the governmental employee acts maliciously or with a wanton or reckless disregard of the rights of another." *Id.* at 474 (emphasis omitted). The *Odom* Court also noted that precedent had described actions taken with an absence of good faith as equating to willful misconduct or capricious, corrupt, or malicious conduct. *Id.* Willful and wanton misconduct is conduct that shows an intent to harm or conduct that demonstrates an indifference to whether harm will result. *Id.* at 475. "[A] plaintiff need not plead a forceful or physical act, such as use of excessive force, but must plead only an *intentional* act." *Id.* at 481.

"The mere existence of probable cause . . . is not the proper inquiry[;]" rather, "[a] police officer would be entitled to immunity . . . if he acted in good faith and honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken." *Id.* The existence of probable cause, however, may be relevant to the analysis, such as where there is a claim of false arrest or false imprisonment, which cannot be sustained when an arrest was legal. *Id.* Whether an officer's conduct was justified and objectively reasonable is not the proper inquiry. *Id.* Instead, the good-faith analysis is subjective in nature; "[i]t protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* at 481-482.

With respect to immunity and intentional torts, because we must assess whether *acts* were undertaken in good faith, it is necessary to examine plaintiff's complaint to identify the acts forming the basis of the claims of assault and battery and false arrest/imprisonment. In regard to the assault-and-battery count, plaintiff alleged that there was "physical contact and/or threat of physical contact" inflicted upon plaintiff, as "referred to herein." In the complaint's general allegations, plaintiff referenced the officers' alleged conduct in grabbing him for purposes of making the arrest, in pushing and pulling plaintiff when moving him from the parking garage to the patrol car, and in handcuffing him without adjusting the handcuffs despite his pleas that they

were too tight. As to the false arrest/imprisonment claim, plaintiff alleged that he was arrested and held against his will without any legal justification or probable cause.

In the simplest of terms, "[a] false arrest is an illegal or unjustified arrest." *Lewis v Farmer Jack Div, Inc*, 415 Mich 212, 218; 327 NW2d 893 (1982). A claim of false arrest requires proof that a defendant participated in an illegal and unjustified arrest, absent probable cause to do so. *Walsh v Taylor*, 263 Mich App 618, 626; 689 NW2d 506 (2004). "A false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant." *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 18; 672 NW2d 351 (2003). "False imprisonment has been defined by this Court as an unlawful restraint on a person's liberty or freedom of movement." *Id*. at 17-18. "The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement." *Walsh*, 263 Mich App at 627 (quotation marks and citations omitted). Additionally, with regard to a claim of false imprisonment, "[t]he restraint must have occurred without probable cause to support it." *Id*.

Assuming for the sake of argument that Officers Shank and Dorman lacked probable cause to arrest plaintiff, which we do not believe was the case, we conclude that there was no evidence that the two officers arrested or confined plaintiff with malicious intent or with a wanton or reckless disregard of plaintiff's rights. In other words, the evidence demonstrated as a matter of law that the officers arrested and confined plaintiff in good faith. Officers Shank and Dorman were operating upon information supplied by Sergeant O'Gorman that video footage from Coney Island revealed that plaintiff had committed an assault and battery. Indeed, Sergeant O'Gorman instructed the officers to arrest plaintiff. As part of the good-faith analysis, whether the arrest or confinement was justified or objectively reasonable is irrelevant. *Odom*, 482 Mich at 481. We hold that Officers Shank and Dorman were shielded by governmental immunity in relation to plaintiff's claim of false arrest/imprisonment.

"To recover civil damages for assault, plaintiff must show an intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *VanVorous v Burmeister*, 262 Mich App 467, 482-483; 687 NW2d 132 (2004) (quotation marks and citations omitted), abrogated on other grounds by *Odom*, 482 Mich 459. With respect to a civil claim of battery, a plaintiff must establish a willful and harmful or offensive touching of another person that results from an act that was intended to cause such contact. *VanVorous*, 262 Mich App at 483. "But . . . government actors may find it necessary—and are permitted—to act in ways that would, under different circumstances, subject them to liability for an intentional tort." *Id.* Thus, "[t]o find for plaintiff on these claims, our courts would have to determine that the officers' actions were not justified because they were not objectively reasonable under the circumstances." *Id*.

The pertinent law regarding governmental immunity and assault and battery involving police officers entails two separate and distinct analyses. We must assess whether there was a genuine issue of material fact as to whether Officers Shank and Dorman acted in good faith in their physical or threatened physical contacts with plaintiff. If an issue of fact does not exist and the officers acted in good faith as a matter of law relative to the claim of assault and battery, they are entitled to summary disposition on the claim. But if an issue of fact exists in regard to good faith,

we must then evaluate whether the officers acted in an objectively reasonable manner in regard to their physical or threatened physical contacts with plaintiff.[1] If an issue of fact does not exist and the officers acted in an objectively reasonable manner as a matter of law, they are entitled to summary disposition on the assault and battery claim. We note that the two questions—good faith and objective reasonableness—can be analyzed in reverse order. The bottom line is that for plaintiff's assault and battery claim to go forward against Officers Shank and Dorman, there must be sufficient evidence to create a factual issue on *both* inquiries. Stated otherwise, if plaintiff failed to create a genuine issue of material fact as to either showing a lack of good faith or a lack of objective reasonableness, the assault and battery claim is unsustainable.

We first address the assault and battery claim by examining the relevant circumstances in chronological order. At the point of plaintiff's arrest in the hospital's parking garage, he was clearly taken by surprise, especially given the earlier amicable interaction between plaintiff and Officers Shank and Dorman. The first act that could potentially be considered an assault was when Officer Dorman threatened plaintiff with the Taser. Although the prosecution argues that Officer Dorman wielded the Taser because plaintiff was resisting arrest and struggling with the officers, we conclude that on the basis of Dorman's bodycam video, reasonable jurors could conclude that the Taser was drawn before plaintiff had engaged in any real resistance. Indeed, the video footage could be construed as showing that plaintiff was not resisting and was simply baffled by the arrest; he asked the officers repeatedly why he was being arrested, a question to which he never received an answer from the two officers. Under Michigan law, "[w]hen arresting a person, without a warrant, the officer making the arrest shall inform the person arrested of his authority and the cause of the arrest, except when the person arrested is engaged in the commission of a criminal offense, or if he flees or if he forcibly resists arrest before the officer has time to inform him." MCL 764.19. The evidence here could reasonably be interpreted as showing that the officers had time to inform plaintiff of the reason for his arrest.

Additionally, although the racial slur Officer Shank allegedly uttered was not made until after plaintiff was placed in the patrol car, it is evidence from which it could reasonably be inferred that Officer Shank's conduct throughout the episode was motivated by racial animus and not good faith. There was also evidence that the handcuffs were placed too tightly on plaintiff's wrists and that his pleas to adjust the handcuffs went ignored until he was in the patrol car. Finally, there was evidence that plaintiff was acquitted of resisting and obstructing the officers.

Viewing the evidence in a light most favorable to plaintiff, one could reasonably conclude that there was no need to point the Taser at plaintiff, that the officers refused to tell plaintiff why he was being arrested although they were mandated by statute to do so, that Officer Shank made a racial slur, that the handcuffs were improperly utilized, and that plaintiff was acquitted of resisting

---

[1] To the extent that it is arguable that this particular question does not technically concern governmental immunity, we nonetheless address it despite the fact that there would be no appeal by right on the matter. See MCR 7.203(A)(1); MCR 7.202(6)(a)(*v*). Assuming an application for leave to appeal was necessary, we shall treat that portion of defendants' appeal on this issue as an application for leave, grant leave, and substantively address the question. See *Wardell v Hincka*, 297 Mich App 127, 133 n 1; 822 NW2d 278 (2012).

and obstructing the officers. Consequently, we conclude that there exists a genuine issue of material fact regarding whether the officers acted in good faith or maliciously when Officer Dorman threatened plaintiff with the Taser. We likewise find that there exists a genuine issue of material fact regarding whether threatening plaintiff with the Taser was objectively reasonable in light of the evidence that it was unnecessary to display the Taser.

Additionally, a battery could be premised on evidence that the officers handcuffed plaintiff too tightly and refused, until the very end of the encounter, to adjust the handcuffs or even bother to check whether they were digging into plaintiff's wrists despite his repeated complaints. As viewed in a light most favorable to plaintiff, all of the evidence referenced above—the unnecessary Taser threat, the racial slur, the unlawful failure to inform plaintiff regarding why he was being arrested, and the acquittals—when considered in conjunction with the evidence that the handcuffs were too tight and not timely checked or loosened, created a genuine issue of material fact regarding whether the officers acted in good faith in relation to the handcuffing of plaintiff.[2] We similarly find that there exists a genuine issue of material fact regarding whether the officers' actions in placing the handcuffs on plaintiff and failing to timely check or adjust the handcuffs were objectively reasonable given the competing testimony and evidence on the matters. Although Officers Shank and Dorman contended that they never had an opportunity to check the handcuffs because they were busy struggling with plaintiff as he resisted and obstructed their efforts to take him into custody, the bodycam evidence suggests that there were moments when the officers could have checked or adjusted the handcuffs. Indeed, a reasonable juror could conclude that if the officers had simply told plaintiff that they would check the tightness of the handcuffs if he settled down for a moment, they would have had an opportunity to check and possibly adjust the handcuffs. Also, had the officers told plaintiff why he was being arrested, it may have tempered plaintiff's behavior and hostility such that the handcuffs could have been checked.

This Court's ruling in *Oliver v Smith*, 290 Mich App 678; 810 NW2d 57 (2010), does not require a different result. The plaintiff in *Oliver* alleged, in part, a claim of assault and battery based on an assertion that the police had handcuffed his wrists too tightly. *Id.* at 681, 688. The parties' primary disagreement was whether the defendant police officer was acting in good faith when he handcuffed the plaintiff. *Id*. at 688. "[T]he trial court concluded that plaintiff's evidence that defendant laughed when he complained that the handcuffs were on too tightly suggested that defendant may not have been acting in good faith, and thus, there was a question of material fact for a jury." *Id.* The *Oliver* panel ruled:

> Plaintiff relies *solely* on defendant's laughter when plaintiff informed him that the handcuffs were too tight to suggest that defendant's decision in that regard may not have been made in good faith. But defendant's laughter after plaintiff's complaint could just as fairly indicate his disbelief of plaintiff, thinking that if he loosened the handcuffs, plaintiff might again endeavor to resist, thereby creating another dangerous situation that defendant was not willing to risk. The laughter

---

[2] We also note that the backseat cam footage that appeared to show that Officer Shank adjusted plaintiff's handcuffs after he was placed in the patrol car constituted evidence from which a person could reasonably infer that the handcuffs had been placed too tightly on plaintiff's wrists.

-11-

could also indicate that defendant was flabbergasted with plaintiff after plaintiff's obstreperous behavior, and had nothing to do with his previous act of cuffing plaintiff. When looking at the situation as a whole, the officers were faced with an unruly individual who was verbally belligerent, actively disturbing a police inquiry, and creating a dangerous situation for the officers involved. Plaintiff was intent on physically resisting arrest and as a result, plaintiff's injuries were just as likely caused by his own repeated efforts to physically thwart the officers' attempts to restrain him and regain control of the situation. Under these facts, considering the vast array of emotions defendant's laughter could signify, even when viewing the evidence in the light most favorable to plaintiff, plaintiff's reliance on the laughter *alone*, without more, did not create a justiciable question of fact with regard to whether defendant acted in good faith when he placed the cuffs on plaintiff. [*Id.* at 689.]

As distinguished from the circumstances in *Oliver*, in the instant case, plaintiff repeatedly complained that the handcuffs were too tight and was continuously ignored, and there were *several* indicia of maliciousness, referenced above, as compared to the singular basis argued by the plaintiff in *Oliver*.

Finally, with respect to the general pulling, pushing, jostling, grabbing, and physical contact that occurred when Officers Shank and Dorman escorted plaintiff from the parking garage to the police car, our initial view based on the evidence is that the officers were dealing with an unruly, combative, and hostile arrestee, such that the officers' conduct in physically controlling plaintiff was made in good faith and was objectively reasonable. But that evidence cannot be viewed in a vacuum, and we must step back and consider the larger perspective. The two recurring themes throughout the entire episode were plaintiff's continual complaints about the handcuffs being too tight and cutting into his wrists and plaintiff's repeated requests that the officers tell him why he was being arrested. As recognized by the trial court, events may not have transpired as they did had Officers Shank and Dorman complied with MCL 764.19 and informed plaintiff of the reason for the arrest and had they checked the tightness of the handcuffs and adjusted them if necessary. A jury should explore this possibility, and if it were the officers' misconduct that triggered defendant's aggressive behavior, we believe that the officers' physical response could constitute an assault and battery. Again, plaintiff was acquitted of the resisting and obstructing criminal charges. We conclude that there exists a genuine issue of material fact regarding whether Officers Shank and Dorman exercised good faith and conducted themselves in an objectively reasonable manner that had a bearing on the physical contact that occurred between the officers and plaintiff while he was being moved from the parking garage to the patrol car. In sum, we hold that the trial court did not err by denying defendants' motion for summary disposition with respect to the assault and battery count.

## 2. GROSS NEGLIGENCE

Defendants next argue that the trial court erred by denying their motion for summary disposition with respect to plaintiff's claim of gross negligence. Defendants contend that the claim is fully premised on intentional conduct. In his complaint, plaintiff alleged that "[d]espite their duty and obligation to intervene on [p]laintiff's behalf when unreasonable force is being applied, [d]efendants failed to intervene and stop unreasonable force from being used; and [d]efendants

ignored [p]laintiff's complaints of pain and that the handcuffs were too tight; and neither of the [d]efendants loosened the handcuffs or otherwise even checked them for tightness."

We have rejected attempts to transform claims that involve the elements of intentional torts into claims of gross negligence. *Latits v Phillips*, 298 Mich App 109, 120; 826 NW2d 190 (2012). And a plaintiff cannot avoid the protections of governmental immunity through the use of artful pleading. *Id.* This Court must determine the gravamen of a plaintiff's action by considering the entire claim. *Id.*

We conclude that defendants were entitled to summary disposition under MCR 2.116(C)(8) on plaintiff's claim of gross negligence. The gravamen of plaintiff's gross negligence claim does not concern negligence or negligent conduct; rather, plaintiff's allegations plainly entail intentional conduct and behavior or intentional failures to intervene by Officers Shank and Dorman. Accordingly, we conclude that the trial court erred by failing to summarily dismiss plaintiff's gross negligence claim.

### 3. CONSTITUTIONAL CLAIM AGAINST THE CITY

Finally, defendants argue on appeal that the trial court erred by denying their motion for summary disposition pursuant to MCR 2.116(C)(10) with respect to plaintiff's constitutional claim against the city that was based on 42 USC 1983. There was no appeal by right relative to the court's ruling on this issue because it did not implicate governmental immunity. But for purposes of judicial expediency, we will treat that portion of defendants' appeal on this claim as an application for leave, grant leave, and substantively address the question. See *Wardell v Hincka*, 297 Mich App 127, 133 n 1; 822 NW2d 278 (2012).

Plaintiff identified two alleged *underlying* constitutional violations in support of his constitutional claim against the city. First, plaintiff argued that the officers lacked probable cause to arrest plaintiff, thereby violating the Fourth Amendment. Second, plaintiff contended that the officers' use of force was unreasonable and also violated the Fourth Amendment. In *York v Detroit*, 438 Mich 744, 754-755; 475 NW2d 346 (1991), our Supreme Court stated:

> In order to establish a claim against the City of Detroit under 42 USC 1983, plaintiff was required to show a municipal policy or custom which caused a violation of . . . constitutional rights. The policy or custom itself need not be unconstitutional. However, . . . an alleged policy of inaction must reflect some degree of fault before it may be considered a policy upon which § 1983 liability may be based. [I]nadequate police training may serve as a basis for liability under § 1983 only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. [T]he requirement of culpability was necessary to establish the causal link between a municipal policy and a constitutional violation[.] [Quotation marks and citations omitted.]

A municipality can only be held liable under § 1983 when its policies are the "moving force" behind a constitutional violation. *Id.* at 755. It may occur that in light of certain duties assigned to officers the need for more or different training is so obvious, and the inadequacy so likely to result in a constitutional violation, that the policymakers of a city can reasonably be said

to have been deliberately indifferent to the need. *Id.* at 756. "Deliberate indifference contemplates knowledge, actual or constructive, and a conscious disregard of a known danger." *Id.* at 757. "Section 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution[.]" *Id.* at 757-758. Accordingly, to establish a § 1983 claim, a plaintiff is required to show not only a municipal policy or custom of deliberate indifference but also to demonstrate that the policy or custom actually caused a violation of a person's constitutional rights. *Id.* at 758.

Plaintiff's theory of liability primarily focuses on the city's alleged failure to adequately train its officers with respect to handcuffing and warrantless arrests. In the trial court, plaintiff argued that there was evidence of "deliberate indifference" on behalf of the city because Officers Shank and Dorman both "admitted that they had not been trained on the lawful way to make a warrantless arrest, and since leaving the academy they had not received any training regarding handcuffing[.]" Plaintiff elaborated that making arrests and handcuffing citizens occur on an almost daily basis; therefore, the lack of training on such routine and oft-occurring job functions is reprehensible and can result in liability. Plaintiff poses similar arguments on appeal. But the record undermines these assertions.

Officer Shank testified that he was trained for over an hour on approximately an annual basis with respect to the use of force. He also testified that handcuffing procedures were covered at the police academy and that he had read the Detroit Police Department's policy on handcuffing. Officer Dorman similarly testified. Both officers did, however, concede that they had not had additional training on handcuffing since being in the academy in 2016 and 2018. Nevertheless, Officer Shank testified that his training included guidance to "check and see if the handcuff was able to move enough . . . on the skin and on the wrist so it wasn't too tight, and you can check with your finger and see if there is a gap." Officer Dorman testified that he was trained to "[e]nsure there is sufficient space in . . . the two cuffs" and "to adjust the size to allow sufficient space between that person's wrist and the cuff" "[i]f there is not." Officers Shank and Dorman further indicated that they had received training on warrantless arrests at the academy but had not received additional training since that time. Specifically, Officer Shank testified that he was trained "[t]hat warrantless arrests usually require probable cause." Officer Dorman likewise testified that he was trained that "[d]epending on the offense . . . you would just need probable cause to believe that the crime occurred and that the subject you were arresting committed the crime."[3]

Plaintiff points to no evidence supporting his argument that this training was inadequate. Instead, he vaguely claimed in the trial court that the officers "admitted that they had not been trained on the lawful way to make a warrantless arrest," which is false, and that the officers admitted that "since leaving the academy they had not received any training regarding handcuffing," which is true, but is not problematic in and of itself. Plaintiff offers no indication as to what additional training would have made a difference in this case. Both officers demonstrated a fair understanding of how to properly handcuff someone, and they also both accurately recognized that probable cause is required for a warrantless arrest. Without any

---

[3] We note that plaintiff does not build any argument tied to the city on the basis of MCL 764.19 and informing an arrestee of the reason for a warrantless arrest.

-14-

evidence—or even an explanation—as to what additional training might have made a difference, it is impossible to conclude that the officers' training on these topics was so inadequate that it reflected a deliberate indifference to the rights of citizens with whom the officers came into contact.

On appeal, plaintiff also suggests that the city's supervision of officers was so inadequate that it demonstrated a deliberate indifference to the constitutional rights of the citizenry. We reject this argument for at least two reasons. First, because plaintiff did not pose a supervision-related argument below, it was unpreserved and effectively waived. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359090); slip op at 3 ("By failing to raise this issue in the trial court, plaintiffs deprived the trial court of the opportunity to correct it in a timely and equitable manner and waived the error."). Second, plaintiff's arguments with respect to a purported lack of supervision in the Detroit Police Department have nothing to do with the officers' conduct at issue in this case. Plaintiff essentially faults the officers' supervisors for failing to follow up with the officers about citizen complaints that they had received regarding the officers. But, as plaintiff acknowledges, the citizen complaints at issue involved unidentified conduct, alleged theft of property during execution of a search warrant, and an allegation of failure to follow basic procedures irrelevant to this case. Plaintiff does not explain how these instances impact his case, and this Court need not come up with those explanations for him. See *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."). Therefore, we conclude that the city was entitled to summary disposition pursuant to MCR 2.116(C)(10) on plaintiff's constitutional claim.

We affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion. We do not retain jurisdiction. No party having prevailed in full, we decline to tax costs under MCR 7.219.


/s/ Mark J. Cavanagh
/s/ Jane E. Markey

-15-